IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARCIA ADAMS, | ) | CASE NO. 1:07-cv-2543 |
| | ) | |
| Plaintiff, | ) | JUDGE O'MALLEY |
| | ) | |
| | ) | MAGISTRATE JUDGE McHARGH |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **REPORT AND RECOMMENDATION** |
| Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to Local Rule. The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Marcia Adam's application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.*, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court recommends the decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

On January 27, 2004, Plaintiff filed an application for Supplemental Security Income benefits, alleging an amended disability onset date of July 1, 2003 due to limitations related to obstructive sleep apnea, asthma, hypertension, obesity, diabetes mellitus, leg edema, major depression, severe, with psychotic episodes, obsessive compulsive disorder, and panic disorder. On September 25, 2006, Administrative Law Judge ("ALJ") Mark M. Carissimi determined Plaintiff

had the residual functional capacity ("RFC") to lift, carry, push or pull ten pounds occasionally, to sit six to eight hours in a workday, and to stand and walk two hours in a workday, with normal breaks.  The ALJ determined Plaintiff had the RFC to perform simple, routine work without high production quotas or piecework involving no more than superficial interaction with co-workers and supervisors and occasional interaction with the public, without negotiation or confrontation. Therefore, the ALJ determined Plaintiff was not disabled (Tr. 25). On appeal, Plaintiff claims that the ALJ erred as a matter of law in failing to properly evaluate the medical opinions, and in failing to properly evaluate Plaintiff's RFC.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Born in November, 1961 (age 44 at the time of the ALJ's determination), Plaintiff is a "younger individual." *See* 20 C.F.R. §§404.1563, 416.963.  Plaintiff last completed one year of college (Tr. 84) and has past relevant work as a Nurse's Assistant and a child care worker (Tr. 79).

### B.  Medical Evidence

Plaintiff began seeing Dr. Rochelle Beachy as her treating physician in 1998 (Tr. 161).  She was diagnosed with high blood pressure and high cholesterol (Tr. 161, 163).  Treatment notes showed that she continued to have hypertension and high cholesterol throughout 1998 and 1999 (Tr. 145-160).  In October 1999, Dr. Beachy indicated that Plaintiff had uncontrolled hypertension, and should not work until her blood pressure was better controlled (Tr. 165).  Dr. Beachy continued to treat Plaintiff for hypertension and obesity in 2001 and 2002 (Tr. 447-53).

On October 15, 2003, Plaintiff was seeing Dr. Monique Turner as her family practitioner (Tr. 219-27).  Dr. Turner noted that Plaintiff had a history of being noncompliant with her medical

treatment (Tr. 219).  A January 2004 treatment note written by Dr. Beachy noted a diagnosis of major depression, single episode, which Dr. Beachy attributed to the loss of Plaintiff's job (Tr. 445), as well as abnormal glucose levels (Tr. 213-17).  On February 2, 2004, Dr. Beachy diagnosed Plaintiff with adult onset diabetes and obesity (Tr. 212).  On August 30, 2004, Dr. Beachy noted that Plaintiff's diabetes was in very good control, and her blood pressure was in better control, but that the swelling in her legs was worse, and she continued to be obese (Tr. 182).  An echocardiogram on September 8, 2004, and deep vein scans of her lower extremities in August and September 2004 were normal (Tr. 190, 470, 473-74).  On September 15, 2004, Dr. Beachy noted that the swelling in Plaintiff's legs had not improved, and that she was "completely noncompliant with diet" (Tr. 432).

On November 1, 2004, Dr. Beachy noted Plaintiff's prior diagnoses of diabetes and hypertension, and also diagnosed her with probable sleep apnea, and ordered a sleep study (Tr. 180).  Dr. Beachy noted that her diabetes had no complications (Tr. 181).  On December 6, 2004, Plaintiff's diabetes was in good control, but her hypertension was again uncontrolled (Tr. 427-28).  On January 4, 2005, Dr. Beachy noted that using oxygen at night had greatly improved Plaintiff's hypertension, her diabetes remained in good control, and that obesity was her biggest health issue (Tr. 422-26).  On January 10, 2005, a sleep study was performed on Plaintiff (Id.).  Though the sleep study was not optimal, she was diagnosed with obstructive sleep apnea (Tr. 425).  On April 4, 2005, both Plaintiff's diabetes and hypertension were in good control (Tr. 419).  Following a second sleep study on May 2, 2005, Plaintiff was diagnosed with severe obstructive sleep apnea, but showed a good response to the use of a C-PAP machine (Tr. 417-18).

On September 6, 2005, Plaintiff reported that she was feeling much better (Tr. 405).  Dr. Beachy noted that her blood pressure and hypertension were in reasonable control (Tr. 406).  Dr. Beachy continued to counsel her on diet and urged her to exercise (Tr. 415).  On January 1, 2006, Plaintiff expressed frustration at her inability to lose weight, but denied any shortness of breath or side effects from her medications (Tr. 400).

On August 18, 2006, Dr. Beachy completed both an assessment of Plaintiff's physical RFC (Tr. 358-61), and a medical source statement (Tr. 362-66).  Dr. Beachy indicated that Plaintiff experienced fatigue, general malaise, pain and numbness in her extremities, difficulty walking, swelling, and leg cramping as a result of her diabetes (Tr. 358).  Her symptoms would often affect her concentration and attention (Tr. 359).  She could walk less than a block, sit continuously for two hours, and stand for no more than ten minutes (Id.).  She needed to be able to shift positions at will, and needed to have five-minute periods of walking every ninety minutes (Tr. 359-60).  She would need unscheduled breaks every two hours (Tr. 360).  For prolonged sitting, she needed to elevate her legs as high as possible, though hip-level would be adequate (Tr. 360).  She could lift less than ten pounds frequently, and ten to twenty pounds occasionally (Id.).  She could never stoop and crouch, and needed to avoid even moderate exposure to extreme heat or cold, high humidity, or atmospheric contaminants (Tr. 361).  She would probably miss more than four days of work each month (Id.).

In her medical source statement, Dr. Beachy indicated that because of her morbid obesity and chronic leg swelling, Plaintiff could stand or walk continuously for no more than fifteen minutes, after which she would need to sit (Tr. 362).  She could sit for less than fifteen minutes before standing or walking again, but could stand for a total of less than one hour in an eight-hour

4

workday (Tr. 362-63).  She could sit continuously for two hours, and could sit for a total of more than six hours in an eight-hour workday (Tr. 363-64).  Lastly, Dr. Beachy indicated that Plaintiff needed to walk for less than fifteen minutes after sitting for two hours, in order to decrease her risk of deep vein thrombosis (Tr. 364).

On January 26, 2004, Plaintiff was given a diagnostic assessment by a social worker at MetroHealth System (Tr. 232-36).  She "talked nonstop" about anger at her employer for letting her go for allegedly cutting a child's arm (Tr. 232).  Plaintiff reported that she had been depressed for more than a year, experienced auditory and visual hallucinations, cried daily, and had suicidal thoughts (Tr. 232-33).  She described herself as feeling "wired up," was not tired despite not sleeping for two days, and had found herself cleaning her house at 4 o'clock in the morning (Tr. 233).  A mental status examination revealed that she was fully oriented, with good judgment and insight, good recent and remote memory, sustained concentration, logical but racing thoughts, and pressured speech (Tr. 235).  She was diagnosed with a schizoaffective disorder, and given a score of 41-50 on the Global Assessment of Functioning ("GAF") scale, indicating serious symptoms (Id.).  On February 3, 2004, Plaintiff continued to complain of hallucinations, suicidal thoughts, and crying for no reason (Tr. 230).  A mental status examination showed that she was fully oriented, with logical thought processes, good judgment and insight, good memory and recall, sustained concentration, and tight associations, but also showed that her mood was depressed and her affect (expression of emotions) was flat (Id.).  She was referred for counseling to Rebecca Snider, a psychiatric clinical nurse specialist (Id.).

Plaintiff met Nurse Snider for the first time on February 24, 2004 (Tr. 328-32).  Plaintiff stated that she had experienced increasing depressive and psychotic symptoms for the past three to

5

four years, and was taking prescription antidepressants (Tr. 328).  She was most concerned about her hallucinations, which began after the birth of her daughter fourteen years ago (Tr. 329).  Plaintiff told Nurse Snider that she only wanted to go back to work "if people don't get on my case" (Tr. 330).  She went to church regularly, and liked to cook, go to the movies, and read (Id.).  Nurse Snider conducted a mental status examination, and concluded that Plaintiff's mood was depressed and her affect restricted, but her insight and judgment were good (Tr. 331).  Her concentration varied but was generally alright (Id.).  She denied having any panic attacks (Id.).  Her recent memory was poor (Id.).  Her energy and motivation varied (Id.).  Nurse Snider gave Plaintiff a GAF score of 50-55, indicating moderate symptoms (Tr. 332).

On March 11, 2004, Plaintiff reported that she remained depressed and tearful, although her sleep, motivation, concentration, and memory had improved slightly (Tr. 326-27).  She still experienced hallucinations, though not as many, but was fully oriented and had fair judgment and insight (Tr. 327).  On April 1, 2004, Plaintiff stated that she still felt depressed but had improved "a little" (Tr. 325).  Her affect was constricted, but she could sustain attention and concentration (Id.).  Her memory was within normal limits, and her insight and judgment were good (Id.).  On April 29, 2004, Plaintiff reported feeling better, but was still isolating herself (Tr. 323).  Her mood was better, her attention was fair, her memory "not too good," and her judgment and insight were good (Id.).  On May 28, 2004, her mood had improved, and she had hallucinations only occasionally (Tr. 321).  Her concentration and memory were impaired, but her judgment and insight were good (Id.).

On July 22, 2004, Plaintiff reported that she was agitated and irritable, and had not taken her medication for three days (Tr. 319).  Her hallucinations were decreased, but her mood varied, her insight and judgment were fair, her recent memory was poor, and she could attend and concentrate

6

only "a little bit" (Tr. 319-20).  On August 17, 2004, Plaintiff said she was doing better (Tr. 317).  Her speech was normal, her thought processes logical, and there was no evidence of delusions (Tr. 318).  She also appeared to have much less paranoid thought (Id.).  She could sustain attention and concentration, and her memory, insight, and judgment were good (Id.).  Plaintiff concluded that her mood was improved, and her psychosis lessened (Id.).  On October 25, 2004, Plaintiff stated that she thought her medications were helping (Tr. 316).  Her mood was better, her energy good, and her concentration "okay" (Tr. 316).  Her memory was within normal limits, and her insight and judgment were good (Id.).  Her condition was generally unchanged on December 3, 2004 (Tr. 314-15), and had improved on January 14, 2005 (Tr. 312-13).  Her mental status was the same on February 11, 2005, and she had only minimal perceptual symptoms (Tr. 311).  Her physical health, however, was affecting her mood (Id.).

On April 11, 2005, Plaintiff reported that she had been able to stop one of her blood pressure medications because she was doing so well (Tr. 308).  Nurse Snider noted only a few paranoid thoughts, poor recent memory, "so-so" attention, and good insight and judgment (Tr. 309).  She concluded that Plaintiff was taking more responsibility for her health (Id.).  On June 6, 2005, Plaintiff reported that she was doing alright, and had no new problems (Tr. 307).  A mental status examination showed that she had no evidence of delusions or paranoia, her mood, insight, and judgment were good, she displayed a full range of emotions, her memory was within normal limits, and she could sustain attention and concentration (Id.).  Nurse Snider concluded that Plaintiff's condition was stable (Id.).  Her condition was generally unchanged at appointments between August 2005 and August 2006, although she occasionally reported concerns related to her physical health, or being upset about her daughter (Tr. 291, 294, 296, 299, 301, 303, 305).  On February 6, 2006,

7

Nurse Snider noted that she was doing fairly well, but was upset about her daughter (Tr. 299).

Nurse Snider completed a checklist assessment of Plaintiff's ability to perform work-related mental activities on September 14, 2006 (Tr. 488-01).  She indicated that Plaintiff had both a schizophrenic disorder and a depressive disorder (Tr. 491, 493-94).  She also indicated that Plaintiff was moderately limited in her ability to relate to others, get along with co-workers, use judgment, make simple work-related decisions, perform simple tasks, understand and remember simple instructions, sustain a routine without special supervision, respond to changes at work, interact with the general public, and behave in an emotionally stable manner (Tr. 488-89).  She was markedly limited in her ability to interact with supervisors and respond to supervision, deal with work stress, complete a normal workday or work-week, be reliable, and use good judgment (Id.).  She was moderately limited in her activities of daily living and in maintaining social functioning (Tr. 501).  She was markedly limited in her ability to maintain concentration, persistence, and pace (Id.).  Plaintiff had also allegedly experienced one or two episodes of decompensation (Id.).

Dr. David V. House performed a consultive psychological examination of Plaintiff on April 14, 2004 (Tr. 244-48).  Plaintiff reported that she had been depressed for a long time (Tr. 246).  She sometimes had panic attacks, engaged in some compulsive behaviors, and often cried for no reason (Id.).  She spent most of the day at the library or the movies, helping her children with their homework, and doing housework (Tr. 247).  She cleaned all the time, sometimes obsessively (Id.).  Dr. House observed that Plaintiff was fully oriented, but her concentration and attention were moderately limited due to depression (Id.).  Her insight and judgment were also moderately limited (Id.).  Her memory for digits was borderline to low average, and her computational skills were deficient (Id.).  She functioned at a reduced level of efficiency (Id.).  Her concentration and attention

8

difficulties might make it difficult for her to follow more complicated directions beyond 3-4 steps, but her ability to follow more simple directions was not affected (Id.).  She was moderately limited in her ability to relate to others, adapt, and withstand stress and pressure (Tr. 247-48).  She required no supervision in handling daily activities or finances (Tr. 248).  Dr. House diagnosed Plaintiff with major depression, severe with psychotic features, obsessive compulsive disorder, and a panic disorder with agoraphobia (Id.).  He gave her a GAF score of 40, indicating some impairment in reality testing based on some irrelevancies of speech (Id.).

Dr. Roy Shapiro reviewed the mental health evidence for the Ohio DDS on July 25, 2004 (Tr. 250-65).  He concluded that Plaintiff was not significantly limited in her ability to understand and carry out short and simple instructions, perform activities to schedule, make simple work-related decisions, work without special supervision, adapt, and get along with co-workers (Tr. 250-51).  She was moderately limited in her ability to work with others, interact with the general public, accept instructions and criticism, and work without interruption from psychologically based symptoms (Id.).  Dr. Shapiro accepted Dr. House's diagnosis of major depression with psychotic features (Tr. 256), but noted that Plaintiff appeared very functional despite these symptoms (Tr. 252).  She maintained a household, shopped, and attended church services (Id.).  For these reasons, he concluded that while she had a mental health disorder, the disorder did not present significant functional limitations (Tr. 252, 263).  She retained the ability to perform simple routine tasks with no strict production or time quotas, and no significant contact with the general public (Tr. 252).

### C. Hearing Testimony

At the administrative hearing on September 25, 2006, Plaintiff testified that she left her last job as a daycare provider because she could not do the job any more (Tr. 517-18).  However, she

also said that her employer wanted to get rid of her "for some reason," and because the employer thought she was responsible for cutting a child for whom she was caring (Tr. 518-20).  Her employer told her they were going to fire her, but would instead allow her to quit so that she would not have that on her record (Tr. 520-23, 526).  She denied having hurt the child, and quit her job (Tr. 521-23, 526).

Plaintiff testified that her main problems were fatigue and depression (Tr. 536).  She took medication for depression (Tr. 536-37).  She could not tell if the medication had helped, or if the psychotherapy she received from Nurse Snider had helped (Id.).  Plaintiff stated that she stayed at home most of the time (Tr. 511-12).  Her mother visited her every day, helped take care of Plaintiff's 15-year-old daughter, and took Plaintiff grocery shopping once a week (Tr. 511-12, 514).  The only household chore she did was a little dusting (Tr. 513).  She had lost about 50 pounds (Tr. 513-14).  Her feet and legs swelled and hurt, and it was difficult to get shoes on (Tr. 515, 537).  She wore a C-PAP machine, which helped her symptoms (Tr. 516, 536).  However, she rarely slept more than three hours a night (Tr. 514).  She needed to take a break while walking up the stairs to her second floor apartment (Tr. 535).  She could not sit for long periods because it made her legs and feet numb (Tr. 538).  And, she often yelled at people, including her daughter, because of her high blood pressure and her depression (Tr. 515-16).

At the administrative hearing, a vocational expert testified that a person of Plaintiff's age, education, background, and RFC could perform a significant number of jobs, including ticket taker (DOT 211.467-034; 2,000 jobs regionally; 400,000 jobs nationally), inspector (DOT 739.687-182; 3,000 jobs regionally; 550,000 nationally), and assembly worker (DOT 754.684-018; 2,500 jobs regionally; 500,000 jobs nationally) (Tr. 541-45).

### III.  DISABILITY STANDARD

A claimant is entitled to receive Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20. C.F.R. §§ 404.1505, 416.905.

### IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed.  *Id.*.  Indeed, the Commissioner's determination, if supported by substantial evidence, must stand, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

11

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V.  ANALYSIS

### A.  The ALJ's Treatment of Plaintiff's Treating Doctors

Plaintiff first claims that the ALJ erred by failing to give controlling weight to the opinion of her treating physician Dr. Beachy because the opinion was well supported and not inconsistent with other substantial evidence.  Plaintiff claims that the reasons given by the ALJ for not giving Dr. Beachy's opinion controlling weight are invalid, and thus, insufficient under the applicable regulations.

The opinions of treating physicians are afforded greater weight than those of physicians who have examined the claimant on consultation or who have not examined the claimant at all.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).  An ALJ is not bound by the opinion of a claimant's treating physician; however, if he or she chooses to reject the opinion, he or she must articulate a reason for doing so. *See Wilson,* 378 F.3d at 545; *Shelman*, 821 F.2d at 321.  Specifically, if a treating source is not accorded controlling weight, the ALJ must apply certain factors – the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the source.  Even still, the reasons offered for a

12

credibility determination need not only comply with these factors, they must also be "good." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 545.  However, the ALJ is not required to credit a treating physician's opinion that is inconsistent with the objective medical evidence or to give substantial weight to a treating physician if his opinion is a mere conclusory statement, unsupported by clinical and/or diagnostic findings. *See Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 538 (6th Cir. 1981).  Indeed, where no objective medical evidence is presented and there is no explanation of a nexus between the conclusion of disability and physical findings, the ALJ may choose to completely disregard the treating physician's opinion. *See Cutlip v. Secretary of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994); *Higgs v. Bowen*, 880 F.2d 860, 863-64 (6th Cir. 1988).

The ALJ explained in his written decision that Plaintiff is followed by Dr. Beachy for hypertension, obesity, and asthma (Tr. 18, 21).  The ALJ reviewed the records provided by Dr. Beachy, including the normal results of Plaintiff's September 2004 echocardiogram and treatment notes related to Plaintiff's weight loss attempts, blood pressure  readings, sleep apnea, and asthma (Tr. 18).  The ALJ also noted that Dr. Beachy completed two questionnaires describing Plaintiff's RFC in August 2006 and that these questionnaires were internally inconsistent (Tr. 22).  The ALJ explains that only one of the questionnaires indicates that Plaintiff should elevate her legs during the day, for 75 percent of the time (Tr. 22).  He also notes that although Dr. Beachy concludes that Plaintiff can sit for no more than six hours in a day on one of the questionnaires, she concludes that Plaintiff can sit for no more than two hours in a day on the other questionnaire (Id., Tr. 358-66).  The ALJ stated in his written decision that he adopted Dr. Beachy's opinion "only insofar as the claimant would reasonably be restricted to sedentary activity." (Tr. 22).  Thus, the ALJ declined to accept Dr.

13

Beachy's opinion to the extent that it posited restrictions greater than sedentary activity.  The ALJ also rejected Dr. Beachy's conclusion, expressed on a diabetes RFC questionnaire, that Plaintiff should elevate her legs 75 percent of the time during an eight-hour work day. (Tr. 22, 360).  In support of his conclusions regarding Dr. Beachy's opinions, the ALJ explained that Dr. Beachy's restrictions were inconsistent with other medical opinions of record, with the descriptions of Plaintiff's functional abilities, and with the ALJ's assessment of Plaintiff's credibility (Tr. 23).  The ALJ also found that Dr. Beachy's own treatment notes did not provide an objective basis for the degree of limitation posited and did not indicate that Plaintiff is mandated to elevate her legs because of edema. (Tr. 22, 350).  For those reasons, the ALJ concluded that Dr. Beachy completed the questionnaires in a manner most favorable to Plaintiff from a subjective standpoint (Id.).

Plaintiff complains that because the ALJ concluded that the two questionnaires provided by Dr. Beachy were inconsistent, the ALJ had a duty to re-contact Dr. Beachy for clarification.  Plaintiff's argument is not well taken.  An ALJ must re-contact medical sources when the evidence that he has received is inadequate to determine whether the claimant is disabled. *See* 20 C.F.R. §§ 404.1512(e), 416.912(e).  In addition, Social Security Ruling No. 96-5p requires the ALJ to re-contact a claimant's treating physician when both (1) the record fails to support the treating physician's opinions as to an issue reserved to the Commissioner; and (2) the basis of the treating physician's opinion is unascertainable from the record.  The only issues which are specifically reserved to the Commissioner include: whether an individual's impairment meets or is equivalent in severity to the requirements of any impairment in the listings, the determination of an individual's RFC, whether an individual's RFC prevents him or her from doing past relevant work, how the vocational factors of age, education and work experience apply, and whether an individual is

14

disabled under the Act. *See* S.S.R. 96-5p; *see also* 20 C.F.R. § 416.927(e).  Dr. Beachy's questionnaires assess Plaintiff's RFC limitations, an issue reserved to the Commissioner.  However, it does not appear that the basis of Dr. Beachy's opinion was unascertainable from the record.

Dr. Beachy explained that his opinion was based upon Plaintiff's obesity with chronic leg edema, asthma, and limited mobility and gait (Tr. 22).  The ALJ adequately explained that because Dr. Beachy's own treatment notes did not provide an objective basis for the degree of limitation posited and did not indicate that Plaintiff is mandated to elevate her legs because of edema, it appeared that Dr. Beachy completed the questionnaires in a manner most favorable to Plaintiff from a subjective standpoint.  In addition, it appears that the inconsistencies between the questionnaires resulted of the nature of the questionnaires themselves.  First, only one of the questionnaires asks whether Plaintiff's legs should be elevated with prolonged sitting, which would explain why Dr. Beachy assessed the 75 percent leg elevation limitation in only one questionnaire (Tr. 360).  Second, only one of the questionnaires asks how long Plaintiff can sit at a time, while both questionnaires ask how long Plaintiff can sit total in an eight-hour work day (Tr. 359, 363).  Thus, it is possible Dr. Beachy thought the question on the questionnaire that only asked how long Plaintiff can sit total in an eight-hour work day was asking how long she could sit at a time.  In that case, the two hour limitation would not be inconsistent.

The ALJ pointed to many factors in support of his conclusion that Dr. Beachy's opinion was not supported by, and inconsistent with, the record as a whole—to the extent that it posited restrictions greater than sedentary activity.  First, the ALJ noted that Plaintiff previously performed work that required constant standing until she lost her job for non-medical reasons after August 2003 (Tr. 22-23).  Although Plaintiff alleges that she cannot perform even sedentary activity, the ALJ

15

noted that no medical crises has occurred since Plaintiff left this job to account for a change in Plaintiff's RFC (Id.).  Second, the ALJ explained that the edema to Plaintiff's lower extremities would be accommodated by the restriction to sedentary work (Tr. 23).  Next, the ALJ pointed out that although Plaintiff has not always been compliant with prescribed treatment, she reported no side effects from her medication and her diabetes and blood pressure have been in control at times. (Id.).  The ALJ also noted that Plaintiff's medical conditions in combination should allow her to perform sedentary work, which is compatible with her description of her daily activities (Id.).  Indeed, Plaintiff reported that she spends most of the day at the library or the movies, helping her children with their homework, and doing housework (Tr. 330).  Plaintiff also goes to church regularly, and likes to cook and read (Tr. 247).  Finally, the ALJ explained that Plaintiff's alleged limitations as described by Dr. Beachy are not supported by sufficient corroborative medical evidence, such as current diagnostic tests, laboratory studies, and ongoing clinical findings (Tr. 23).  Even if such limitations had been present on a temporary basis, they were not established as having persisted for twelve months. (Id.).  A review of the ALJ's written decision thus shows that the ALJ considered the nature and extent of Plaintiff's treatment relationship with Dr. Beachy, the supportability of Dr. Beachy's opinion, and the consistency of this opinion with the record as a whole, in accordance with 20 C.F.R. § 404.1527(d)(2)-(6).

There is substantial evidence to support the ALJ's conclusions with respect to Dr. Beachy's opinions. Dr. Beachy listed Plaintiff's obesity with chronic leg edema, asthma, and limited mobility and gait as reasons for the limitations she assessed with respect to Plaintiff (Tr. 22).  However, Plaintiff's September 2004 echocardiogram and deep venous scan had normal results.  Plaintiff's treating care physicians have noted that her obesity and hypertension are the biggest health issues

16

contributing to her other problems (Tr. 182, 451, 427).  Yet, Plaintiff has not been successful in weight loss and has a history of non-compliance with her medications and diet (Tr. 226, 459, 452, 457, 432, 407).  At times, Plaintiff has suffered edema and increased complaints of pain due to her medical problems (Tr. 210, 298, 318, 323, 399, 412, 432).  However, on multiple occasions, Plaintiff's physicians have noted that her blood pressure was in good control with medication compliance. (Tr. 212, 427, 443, 453, 451).  Indeed, it appears that Plaintiff's symptoms improved when she was compliant with her medications and her diabetes and hypertension were well-controlled.  To illustrate, Plaintiff complained that her pain was at an 8/10 in her feet and legs in April and August 2004 (Tr. 318, 323).  Around this time, her physician noted that she was noncompliant in diet and that her hypertension was in sub-optimal control (Tr. 432).  In November 2004, Plaintiff reported that her pain was only at a 3/10, and it was noted that her diabetes was in control (Tr. 316, 428).  Although Dr. Beachy has observed edema at various points throughout the record, these occasions also coincide with Plaintiff's failure to comply with her medications and diet (Tr. 399, 412, 432).[1]  Moreover, Dr. Beachy did not indicate in a single treatment note or other record, other than in one August 2006 questionnaire, that Plaintiff should elevate her legs, despite setting forth other limitations due to Plaintiff's edema and obesity.  For example, Dr. Beachy

---

[1]Plaintiff's physicians noted that she had no edema in August 2002 and in May 2003 (Tr. 448-49, 453).  Plaintiff position at a day-care was terminated in August 2003 (Tr. 517).  Although Dr. Beachy noted edema in January 2004, in February, Plaintiff had no complaints, her blood pressure was in good control, and her blood sugar control was improving (Tr. 443-45).  Dr. Saegh observed no edema in March 2004 (Tr. 239).  It was noted at this time that Plaintiff could squat and rise without problems (Id.).  Dr. Beachy indicated that Plaintiff had severe edema in August and September 2004, but noted that Plaintiff was completely noncompliant with diet and that her hypertension was in sub-optimal control (Tr. 432).  Dr. Beachy  observed edema again in June 2005, but noted that Plaintiff was completely noncompliant with her medications (Tr. 412).  In March 2006, Dr. Beachy indicated that Plaintiff's had chronic edema, but that she had not been compliant with diet and thus, was gaining weight (Tr. 399).

concluded in February 2004 that Plaintiff's limitations from edema and obesity consisted of an inability to stoop, bend, sit or stand for long periods of time (Tr. 210).  However, Dr. Beachy did not assess any limitations for Plaintiff with respect to elevating her legs (Id.).  Thus, the ALJ was correct  in his observation that Dr. Beachy's own treatment notes do not indicate that Plaintiff is mandated to elevate her legs because of edema.

For the foregoing reasons, the Magistrate Judge concludes there is substantial evidence to support the ALJ's treatment of Dr. Beachy's opinion.  Because the basis of Dr. Beachy's opinion was ascertainable from the record, the ALJ was not required to re-contact Dr. Beachy regarding the inconsistencies in the two August 2006 questionnaires.

## B. The ALJ's RFC Assessment

Plaintiff claims that the ALJ erred as a matter of law in failing to properly evaluate her RFC.  Plaintiff claims that according to Social Security Rule 96-8p, the RFC assessment requires the ability to sustain activity on a regular and continuing basis, eight hours a day, five days per week, or the equivalent.  Plaintiff claims that a remand is warranted because the ALJ failed to base his RFC on Plaintiff's ability to do such sustained and continuous competitive work (Id.).  Plaintiff claims that she is actually unable to sustain activity on a regular and continuing basis because according to the opinions of Dr. Beachy and Nurse Snider, she is unable to be reliable or even show up for work.

Citing *Cohen v. Secretary of H.H.S.*, 964 F.2d 524 (1992) and *Walston v. Gardner*, 381 F.2d 580 (6th Cir. 1967), Plaintiff claims that the ALJ erred in citing her sporadic daily activities in determining what she can do on a sustained basis.  Citing *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001), Plaintiff claims that even if the ALJ had reasons for rejecting a treating physician's opinion, there must still be some medical opinion from an examining physician that supports the

18

ALJ's RFC finding.

According to Dr. Beachy, Plaintiff is unable to sustain activity on a regular and continuing basis, eight hours a day, five days per week, or the equivalent, because she is unable to be reliable (Tr. 361 and 488).  However, according to the record, Plaintiff spends most of the day at the library or the movies, helping her children with their homework, and doing housework (Tr. 330).  Plaintiff also goes to church regularly, and likes to cook and read (Tr. 247).  According to the ALJ, such activities show that Plaintiff is capable of sustained activity required for a sedentary level occupation (Tr. 18, 25).  Additional evidence the ALJ relies upon to support his conclusion includes evidence that Plaintiff worked at a job that required her to stand all day until mid-2003; that she left the job involuntarily for non-medical reasons; that the medical evidence indicated that she was already experiencing obesity and edema while she was still working; that she had not had any major medical events since that time; and that her physical impairments had not required acute care and treatment (Tr. 21-23).   In addition, in *Cohen*, the court awarded a claimant disability insurance benefits, holding that the claimant's sporadic employment and educational endeavors did not warrant a finding that the claimant maintained the residual functional capacity to perform her previous work or to maintain substantial gainful employment in the national economy.  In *Walston*, the court awarded a claimant disability insurance benefits, holding that the claimant's sporadic employment did not show what the claimant was able to do on a sustained basis due to the fact that such sporadic activity merely represented the claimant's unsuccessful attempts to secure employment after a severe car accident that left him disabled and in great pain.

The courts in *Cohen* and *Walston* ruled based on the specific facts involved in those cases which primarily addressed sporadic employment/education and its potential inability to show what

the claimants could do on a sustained basis.  In the present case, however, the activities used by the ALJ to show what Plaintiff can do on a sustained basis are regular, daily or weekly activities which are disimilar to sporadic employment.  In addition, the work experience cited by the ALJ was not sporadic; rather, it was a single job held by Plaintiff approximately until Plaintiff's disability onset date.  Thus, the facts in this case support the conclusion reached by the ALJ that these activities and work experience show what Plaintiff can do on a sustained basis.

Lastly, according to the court in *Hutsell*, "some medical evidence must support the determination of the claimant's residual functional capacity, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  In the present case, the ALJ considers medical evidence including, but not limited to, controlled blood pressure and diabetes, improved sleep apnea, improved mood, and weight loss (Tr. 19, 165, 321, 513-14, 536).  Therefore, Plaintiff's claims that the ALJ erred as a matter of law in failing to property evaluate her RFC are unfounded and therefore, rejected.

### C. "Other Sources"

The ALJ is required to consider all of the available evidence in an individual's record, which may include information provided by "other sources."  Information from "other sources" may provide insight into the severity of the impairments and how they affect an individual's ability to function. S.S.R. No. 06-03p.  However, S.S.R. No. 06-03p also states that "only acceptable medical sources can be considered treating sources whose medical opinions may be entitled to controlling weight."  According to S.S.R. No. 06-03p, "acceptable medical sources are: licensed physicians; licensed or certified psychologists; licensed optometrists' licensed podiatrists; and qualified speech-language pathologists."

20

### 1. Nurse Snider

Plaintiff claims that according to SSR 06-3p, nurse practitioners are considered acceptable medical sources, and their opinions are therefore entitled to controlling weight.  Plaintiff claims that the ALJ did not comply with this mandate when he failed to evaluate Nurse Rebecca Snider's opinion.  Plaintiff claims that the ALJ ignored the requirements of SSR 06-3p which requires ALJs to consider opinions from "other medical sources," such as nurse practitioners like Nurse Snider (Id.).  Plaintiff also claims Nurse Snider's opinion was medically well supported and consistent with Dr. Beachy's and Dr. House's medical opinions.

In this case, Nurse Snider, a nurse practitioner, is not an "acceptable medical source." Therefore, she cannot be considered a treating source whose medical opinion may be entitled to controlling weight, and her opinion is not sufficient to establish the existence of a medically determinable impairment.  In addition, although Nurse Snider is an "other source" whose opinion may be used to show the severity of Plaintiff's impairments and how they affect her ability to function, the ALJ correctly discredits this opinion due to a lack of sufficient corroborative evidence to support the severity of Plaintiff's impairments it suggests.

In support of his decision to discredit Nurse Snider's opinion, the ALJ cited material from Nurse Snider's treatment notes that contradicted assertions Nurse Snider made with regard to Plaintiff's mental RFC.  Her treatment notes stated that Plaintiff's schizophrenic symptoms had decreased, her judgment and insight were generally good, her mood improved throughout time, her memory was normal, her judgment and insight were generally good, and she was able to sustain concentration (Tr. 19, 23-24 <u>citing</u> Tr. 391-92, 299-300, 303-04, 312-13, 327, 330-31).  Nurse Snider's treatment notes also indicated that Plaintiff had one or two episodes of decompensation (Tr.

501).  These notes are inconsistent with Nurse Snider's assertion that Plaintiff's concentration was so deficient that it rendered her functionally impaired up to half of the time (Tr. 19, 23-24 <u>citing</u> Tr. 391-92, 299-300, 303-04, 312-13, 327, 330-31).  These notes are also inconsistent with the lack of medical evidence reflecting any episodes of decompensation (Tr. 20).  Therefore, Plaintiff's claim that the ALJ erred in failing to evaluate the opinion of Nurse Snider according to the requirements of S.S.R. No. 06-03p, is rejected.

## 2. Dr. House

Plaintiff claims that the ALJ erred in discounting the opinion of the consultive examiner, Dr. House.  In this case, the ALJ rejected the consultive examiner's opinion, arguing that it was inconsistent with the evidence and that his reports did not corroborate the degree of severity that the ALJ found (Tr. 18 and 24).  Plaintiff claims, however, that Dr. House's report is internally consistent and supports Dr. Beachy's, Nurse Snider's, and other witnesses' statements.

Dr. House assigned Plaintiff a GAF score of 40 (Tr. 248).  However, Dr. House's report detailing Plaintiff's daily activities does not corroborate with this degree of severity (Tr. 18, 248).  According to Dr. House's report, Plaintiff's daily activities include helping her children with their homework, going to the library or the movies, cleaning her house, and cooking dinner (Tr. 247).  Dr. House also reported that she attends church services regularly (Id.).  Dr. House observed that Plaintiff is able to follow simple directions and required no supervision in handling daily activities or finances (Tr. 248).  Nevertheless, Dr. House observed that Plaintiff's concentration and attention were moderately limited due to depression (Tr. 247).  He also observed that her insight and judgment were moderately limited (Id.).  He found that concentration and attention difficulties might make it difficult for her to follow more complicated directions beyond 3-4 steps, but her ability to

22

follow more simple directions was not affected (Id.).  Dr. House found that Plaintiff was moderately limited in her ability to relate to others, adapt, and withstand stress and pressure (Tr. 247-48).

Considering this evidence, while also considering the evidence that when Plaintiff was first assessed by Nurse Snider in February 2004, she assigned Plaintiff a moderate GAF score between 50 and 55, there is substantial evidence to support the ALJ's decision that Dr. House's GAF score of 40 is inconsistent with and unsupported by the evidence of record, which shows Plaintiff to have only moderate limitations.  Therefore, Plaintiff's claim that the ALJ erred in discounting the opinion of Dr. House is rejected.

## VI.  DECISION

For the foregoing reasons, the Magistrate Judge finds the decision of the Commissioner that Plaintiff was not disabled is supported by substantial evidence.  Accordingly, the Court recommends the decision of the Commissioner be AFFIRMED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge

Date: July 15, 2008

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).